Dr. Helen
MARTIN–TRIGONA, Plaintiff,

v.

BOARD OF TRUSTEES OF the UNIV-
ERSITY OF the DISTRICT OF
COLUMBIA, Defendant.

Civ. A. No. 83–3521.

United States District Court,
District of Columbia.

June 25, 1987.

Joel P. Bennett, Washington, D.C., for plaintiff.

Dominique Kirschner, Asst. Corp. Counsel, Washington, D.C., for defendant.

### MEMORANDUM

JOHN GARRETT PENN, District Judge.

The plaintiff filed this case, in which she contends that she has been the victim of sex and race discrimination, pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq*. The case came before the Court for nonjury trial. This Memorandum constitutes the Court's findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52.

### I

1. Plaintiff is a white female faculty member of the University of the District of Columbia.

2. The University of the District of Columbia (UDC) is an institution of higher education in the District of Columbia, run by the District of Columbia government.

3. All Presidents of the University of the District of Columbia have been black

males. All Provosts of UDC have been black. There is currently one white Dean at UDC.

4. Of the sixteen department chairpersons who report to Dean Butler only two are not black.

5. On or about June 15, 1984, plaintiff filed a charge of discrimination based upon her race and sex with the Equal Employment Opportunity Commission.

6. Plaintiff received a right to sue letter from the U.S. Department of Justice dated February 14, 1985. Plaintiff filed the current action within ninety days of receipt of the right to sue letter.

7. UDC draws its faculty members from the United States and from foreign countries.

8. As of June 30, 1981, there were 1449 full time employees at UDC, of whom 1096 or approximately 75.6% were blacks, 260 or approximately 17.9% were whites; 589 or approximately 40% were black females and 86 or approximately 6% were white females.

9. As of June 30, 1982, there were 1438 full time employees at UDC, of whom 1099 or approximately 76.2% were black, 599 or approximately 5.2% were white females.

10. For the period October, 1980 to June, 1981, approximately 84% of the new hires at UDC were black, 8% were white and none were white females.

11. For the period July, 1981 to June, 1982, approximately 87.8% of the new hires at UDC were black, 7.3% were white and none were white females.

12. For the period March, 1982 to June, 1982, UDC's review of applicant flow chart revealed that of the persons who applied for jobs at UDC, approximately 75% were black and 17% white.

13. Of the persons hired by UDC between July 1981 and June 1982, approximately 87.8% were blacks and approximately 7.3% were whites.

14. For the period July, 1980 to June, 1982, blacks comprised approximately 90.8% of all employees promoted and

whites approximately 8.3% of the 120 employees promoted.

15. At all times pertinent to this litigation prior to March, 1983, Joseph G. (Tex) Gathings was Chairman, Department of Communicative and Performing Arts, UDC, now Mass Media Performing Arts.

16. At all times pertinent to this litigation after March, 1983, Ann J. Covington was Chairman, Communications Sciences Department, UDC, now Communication Arts & Sciences.

17. At all times pertinent to this litigation after March, 1983, Elaine Bowman was Assistant to the Chairman, Communication Sciences Department, UDC, now Communication Arts & Sciences.

18. At all times pertinent to this litigation, Willie Faye Garrett was a member of the faculty at UDC; prior to March, 1983 in the Department of Communications Sciences, now Communication Arts & Sciences.

19. At all times pertinent to this litigation, Robert E. West was a member of the faculty, UDC, in the Department of Performing Arts.

20. At all times pertinent to this litigation, Dr. Marie Racine was Associate Dean, College of Liberal and Fine Arts, UDC.

21. Mr. Gathings, Ms. Covington, Ms. Bowman, Ms. Garrett, Mr. West, and Ms. Racine are black.

22. At all times pertinent to this litigation, Dr. John Butler served a Dean, College of Liberal and Fine Arts, UDC. The speech program, in which plaintiff was a faculty member, was within the College of Liberal and Fine Arts.

23. Dr. Broadus N. Butler served as Vice President of Academic Affairs at UDC at times pertinent to this litigation. Dr. Butler made recommendations concerning promotion and salary/step increases for UDC faculty members.

24. In 1983, the speech program of the Department of Communicative and Performing Arts at UDC included, as faculty members, plaintiff, Dr. Cleo Gray, Ms. Maxine Legall and Ms. Willie F. Garrett.

25. On March 1, 1983, administration of the speech program was transferred from the Department of Communicative and Performing Arts to the Department of Communication Sciences. The name of the latter was changed to the Department of Communication Arts and Sciences.

26. The plaintiff, is a faculty member within the bargaining unit of faculty of UDC.

27. UDC Bargaining unit facility may be evaluated for various time periods, for example, the calendar year, the academic year, or a period longer than an academic year. The evaluation for a particular time period may affect an academic year contract for the following year.

28. Evaluations of UDC bargaining unit faculty are conducted by an evaluation Committee comprised of other faculty members in the evaluee's department. Each faculty member is responsible for submission to the Evaluation Committee of a complete and organized evaluation folder. UDC does not require any particular quantity of documents to be included in the evaluation folder. If a faculty member desires that specific activities relating to (1) scholarship and professional growth, (2) university service, and (3) professionally related community service, be considered in the evaluation procedure, the faculty member must submit verifiable evidence of the activities with the evaluation profile sheet. Each faculty member is responsible for submission of his own folder and decides what materials are to be included in the folder. It is the responsibility of the peer Evaluation Committee to consider a faculty member's folder and evaluate him.

29. The Dean may concur or non-concur in the Evaluation Committee's evaluation. Where the Dean intends to non-concur, he first submits to the Committee a notice of intent to non-concur. The Evaluation Committee then may reevaluate the folder and resubmit it to the Dean. The Dean may concur or non-concur.

30. The Dean also makes recommendations for step increases. The Vice President for Academic Affairs make recommendations to the UDC President. Final deci-

sions on step increases are made by the UDC President.

31. Dean J. Butler, of the College of Liberal and Fine Arts, has formulated criteria which he considers in deciding whether to recommend a faculty member for a step increase. For the academic year 1978–79 evaluation period, his criteria were stated in the memoranda, (1) May 31, 1979, J. Butler to the Record, "Rationale for Dean's Recommendations for Merit Increases", and (2) September 10, 1979, J. Butler to Department Chairman "Basis of Dean's Consultation with Vice-President on Merit Increases." For the fall 1979—December 31, 1980 evaluation period, Dean Butler's criteria were stated in the memorandum, May 22, 1981, J. Butler to Chairpersons and Faculty, "Faculty Evaluations—Dean's Review and Recommendations." For the calendar year 1981 evaluation period, Dean Butler's criteria were stated in the memorandum, April 6, 1982, J. Butler to Keith, "Faculty Evaluation revisions." For the calendar year 1982 evaluation period, Dean Butler's criteria were stated in the memorandum, May 31, 1982, J. Butler to College Faculty, "promotions and Step Raises: Dean Recommendations." For the calendar year 1983 evaluation period, Dean Butler's criteria were stated in the memorandum, April 17, 1984, J. Butler to Faculties "Recommendations for 1984–85 Contracts".

32. During academic year 1978 to 1979, plaintiff had a contract with UDC for the position of Professor, Step 8 ($28,265 salary).

33. For the evaluation period academic year 1978–79, the Department Evaluation Committee gave plaintiff an evaluation score of 91.8 percent.

34. The Evaluation Committee included Judith Baldinger, Chairperson, and Daphne Northington.

35. Dean J. Butler did not concur in the plaintiff's evaluation for the academic year 1978–79 because there was insufficient documentation to support the rating of 25% for plaintiff's professional achievements.

36. The Dean's criteria for recommending merit increases for that year provided that a one-step increase would be recommended for those individuals who were three percentage points above their department's norm. Plaintiff's evaluation score —91.8 percent—was not 3 percentage points above her Department's norm (90 percent). Therefore Dean J. Butler did not recommend a step-increase for plaintiff for the 1979–1980 academic year. The UDC President concurred. Therefore, plaintiff was awarded a retention contract (i.e., a contract at the prior year's grade level) for academic year 1979–80 (professor, Step 8, $29,835). See following memoranda: (1) May 31, 1979, J. Butler to the Record, "Rationale for Dean's Recommendation for Merit Increases"; (2) "Faculty Evaluation Profile", College of Liberal and Fine Arts, for Dr. Helen Martin-Trigona, Academic year 1978–79; (3) August 9, 1979, Carter to Martin-Trigona, Letter confirming employment for 1979–80 academic year.

37. Plaintiff did not appeal her contract for the 1979–80 academic year.

38. Plaintiff never complained to the Equal Employment Opportunity Commission (EEOC) that her 1979–1980 academic year contract salary was based on discrimination.

39. During the summer of 1979, plaintiff had an independent contract with UDC to teach summer classes.

40. Plaintiff's contract salary for teaching in the summer of 1970 was $2,238 for teaching one course and was based on 10 percent of her academic year salary.

41. Plaintiff never complained to the EEOC that her salary for the 1979 summer was based on discrimination.

42. During academic year 1979 to 1980, plaintiff had a contract with UDC for the position of Professor, step 8 ($29,835).

43. For the evaluation period academic year 1979–80, there was no agreement between bargaining unit faculty and UDC concerning evaluation procedures and therefore no faculty evaluations were performed.

44. Retention contracts were issued to all bargaining unit faculty for the 1979–80 academic year.

45. Plaintiff was issued a retention contract for the 1980–81 academic year (professor, Step 8, $31,905). See following memorandum: Carter to Martin-Trigona, letter confirming employment for 1980–81 academic year.

46. Plaintiff did not appeal her contract for the 1980–81 academic year.

47. Plaintiff complained to the EEOC that her 1980–81 academic year contract was based on discrimination.

48. During the summer of 1980, plaintiff had another contract with UDC to teach summer classes.

49. Plaintiff's contract salary for teaching in the summer of 1980 was $2,040 for teaching two classes and was based on the part-time salary schedule. The contract was consistent with the Master Agreement.

50. Plaintiff never complained to the EEOC that her salary for the 1980 summer was based on discrimination.

51. During academic year 1980 to 1981, plaintiff had a contract with UDC for the position of Professor, step 8 ($32,905).

52. Evaluations for the evaluation period fall, 1979, through December 31, 1980, may have affected the 1981–82 academic year contracts.

53. Plaintiff was the Chairperson of the Evaluation Committee for the period fall 1979 through December 1980.

54. The Evaluation Committee for that period included Judith Baldinger, Joseph Elam, Jean Ramey, and the plaintiff.

55. The Evaluation Committee submitted the evaluations to Dean J. Butler without the required Student Assessment component.

56. On April 19, 1981, Dean J. Butler informed the Committee that he would not concur in the evaluations because the student assessment component was omitted.

57. The Evaluation Committee then removed plaintiff as Chairperson.

58. The evaluation folders were returned to the Evaluation Committee, which returned the folders to faculty for resubmission.

59. On May 4, 1981, the Evaluation Committee resubmitted the evaluation folders to Dean J. Butler; however, the folders of Dr. Helen Martin-Trigona and Joseph Elam were not resubmitted by the Evaluation Committee.

60. Plaintiff did not resubmit to Dean J. Butler her evaluation folder (including the faculty evaluation profile sheet with the required student assessment component) after the folder had been returned to her with the Dean's Notice of Intent to Nonconcur. Thus, for the evaluation period fall 1977–December 1980, plaintiff's evaluation was not completed.

61. Dean J. Butler did not recommend that plaintiff receive a step increase because her evaluation was never completed. As noted above, the faculty evaluation profile for plaintiff contained no student assessment component. Dean J. Butler stated his intent to non-concur in plaintiff's evaluation because the student assessment component was omitted. The Evaluation Committee never assessed the student assessment component of plaintiff's evaluation. Dean J. Butler non-concurred in plaintiff's evaluation and did not recommend plaintiff for a step increase, because the evaluation process was never completed.

62. The Interim Vice President for Academic Affairs, Barbara Carter, recommended a one step increase for plaintiff's 1981–82 academic year contract. The UDC president decided to award plaintiff a one-step increase for the 1981–82 academic year.

63. Plaintiff never complained to the EEOC that her contract for the 1981–82 academic year or her incomplete evaluation for the period fall, 1979, through December 31, 1980 was based on discrimination.

64. During the summer of 1981, plaintiff had another contract with UDC to teach summer classes.

65. Plaintiff's contract salary for teaching in the summer of 1981 was $1,245 for teaching one class and the contract was based on the part time salary schedule. The contract was consistent with the Master Agreement.

66. Plaintiff never complained to the EEOC that her salary for the 1981 summer was based on discrimination.

67. During academic year 1981 to 1982, plaintiff had a contract with UDC for the position of Professor, step 9 ($34,750).

68. Evaluations for the evaluation period calendar year January 1981 through December, 1981, may affect the 1982–83 academic year contracts.

69. The Evaluation Committee for the 1981 calendar year evaluation period consisted of Willie Faye Garrett, Chairperson, Judy Baldinger, Susan Edison, and Daphne Northington.

70. For the evaluation period calendar year 1981, the Evaluation Committee evaluated plaintiff as unsatisfactory because she failed to submit a complete evaluation folder addressing all components.

71. Dean J. Butler stated his intent to non-concur in the evaluation because the evaluation process had not been completed.

72. Dean J. Butler did not recommend plaintiff for a step increase for the 1982–83 academic year because her evaluation was never completed.

73. Plaintiff was issued a retention contract for the 1982–83 academic year (professor, step 9, $36,470).

74. In 1983, Dean J. Butler and Dr. Broadus Butler, Acting Vice President for Academic Affairs, requested the Evaluation Committee to reconvene and reevaluate plaintiff for the 1981 calendar year evaluation period.

75. The Evaluation Committee concluded that it could not reevaluate plaintiff because she refused to organize and complete her evaluation folder.

76. The Evaluation Committee transferred plaintiff's evaluation folder to Dean J. Butler.

77. Dean J. Butler, in turn, transferred plaintiff's evaluation folder to Dr. B. Butler, Acting Vice President for Academic Affairs. Thus, plaintiff's evaluation for the 1981 calendar year was never completed.

78. Plaintiff never complained to the EEOC that her 1982–83 academic year contract or her incomplete evaluation for the 1981 calendar year were based on discrimination.

79. UDC's first responsibility is not to offer summer employment to faculty but rather to offer a range of courses to serve students. Summer school is separately funded and the amount of funding available affects the summer courses offered.

80. Until the signing of Second Master Agreement, UDC Departments were free to offer summer employment to faculty using either a percentage of annual salary or UDC's part-time salary schedule.

81. Before the signing of the Second Master Agreement, two departments of the College of Liberal and Fine Arts chose to offer the part-time salary schedule for summer classes. Use of the part-time salary schedule allowed the Departments to expand the schedule of summer classes and offer summer teaching opportunities to a large number of faculty. The Department of Communicative and Performing Arts, plaintiff's department, offered summer classes on the part-time salary schedule.

82. Under the Second Master Agreement, all summer teaching offers to bargaining unit faculty had to be based on a percentage of the academic year salary.

83. In May 1982, plaintiff was offered and accepted a contract for summer teaching at the rate of $1,360.

84. As a result of the signing of the Second Master Agreement, summer teaching contracts for bargaining unit faculty had to be adjusted in order to be based on a percentage of the academic year salary. Plaintiff wrote to the President that her summer teaching contract was not consistent with the contract, and that her salary should be based on a percentage of her academic year salary. UDC adjusted the summer salaries of all bargaining unit faculty (including plaintiff) such that the summer salaries were based on a percentage of academic year salary and were consistent with the Second Master Agreement.

85. Plaintiff never complained to the EEOC that her contract for teaching 1982 summer classes was based on discrimination.

86. During academic year 1982 to 1983, plaintiff had a contract with UDC for the position of Professor, Step 9 ($36,470).

87. The Evaluation Committee for the evaluation period January 1982–December 1982 consisted of Willie Fay Garrett, Chairperson, Joseph Elam, Susan Edison, and Lloyd Jones.

88. For the evaluation period calendar year January 1982–December 1982, the Evaluation Committee gave plaintiff an evaluation total score of 86.79 percent.

89. Dean J. Butler concurred in the evaluation.

90. Plaintiff's evaluation score was below the norm for her Department. Therefore, Dean J. Butler did not recommend plaintiff for a step increase. The UDC President concurred. Plaintiff was issued a retention contract for the 1983–84 academic year (professor, step 9, $39,010).

91. Plaintiff never complained to the EEOC that her evaluation for the 1982 calendar year or her contract for the 1983–84 academic year were based on discrimination.

92. In 1983, the speech program of the Communicative and Performing Arts Department included Dr. Cleo Gray, Ms. Maxine LeGall, Ms. Willie F. Garrett, and plaintiff. Effective March 1, 1983, administration of the speech program was transferred from the Communicative and Performing Arts Department to the Department of Communicative Sciences. The name of the Department of Communications, Sciences, was then changed to the Department of Communication Arts and Sciences.

93. The decision to transfer the speech program was a programmatic one; that is, the decision was made to transfer administration of the speech program. The Dean did not decide that plaintiff, as an individual faculty member, should be transferred.

94. The union grieved the transfer of administration of the speech program to the UDC president and contended that the transfer violated the Master Agreement. The UDC President responded that it was the right of management to organize the University. The union failed to take the matter to an arbitrator as provided in the Master Agreement.

95. Plaintiff never complained to the EEOC that UDC's transfer of the administration of the speech program was based on discrimination.

96. As noted above, administration of the speech program was transferred to the Department of Communication Sciences, UDC. Faculty comprising the speech component were directed to present themselves and report to the chairperson of the Department of Communication Sciences (Chairperson Dr. Ann J. Covington). Dr. Martin-Trigona did not report to Dr. Covington as directed.

97. For pay period March 1, 1983 to March 15, 1983, timekeeper Elaine Bowman declined to certify plaintiff's time and attendance because the timekeeper could not verify plaintiff's fulfillment of her obligations.

98. For pay period March 1, 1983 to March 15, 1983, Dean J. Butler signed the plaintiff's time and attendance sheet because the Dean assumed that plaintiff had probably or most likely met her responsibilities.

99. Dean J. Butler requested that plaintiff's paycheck for the period 3/1/83–3/15/83 be withheld because there were reports that plaintiff had failed to meet several of her classes, and plaintiff still had not reported to her department chairperson, Dr. A. Covington.

100. On April 1, 1983, the regular pay day, Dean J. Butler, based on the advice of the UDC General Counsel, requested that plaintiff's paycheck for the period 3/1/83–3/15/83 be released to plaintiff on April 1, 1983 (the first day the check was due), because the Dean had certified the time sheet. Plaintiff's pay check for the period 3/1/83—3/15/83 was released to plaintiff on April 1, 1983.

101. For pay period March 16, 1983 to Mach 31, 1983, timekeeper Elaine Bowman

again declined to certify plaintiff's time and attendance because the timekeeper could "not honestly verify the fulfillment of Dr. Helen Martin-Trigona's faculty obligation."

102. For pay period March 16, 1983 to March 31, 1983, plaintiff's time and attendance was not certified and therefore UDC did not prepare a pay check for plaintiff for the April 15, 1983 payday.

103. Plaintiff subsequently reported to her Department Chairperson Dr. Ann Covington. Once this occurred, plaintiff's time and attendance for pay period March 16, 1983 to March 31, 1983 was certified; a cash advance voucher was prepared; and plaintiff received the full amount of pay for that pay period.

104. Plaintiff never complained to the EEOC that her paychecks for the periods March 1, 1983 to March 15, 1983 and March 16, 1983 to March 31, 1983 were withheld or delayed because of discrimination.

105. On April 12, 1983, Dean J. Butler recommended to B. Butler, Vice President for Academic Affairs, that an adverse action be initiated leading to the termination of Dr. Helen Martin-Trigona under § 904.1 of the UDC Faculty Administrative Personnel Policies, 1980, namely "Removal or dismissal for unfitness to perform: .... gross personal or professional misconduct that would invoke widespread condemnation by the academic community in general." Dean J. Butler noted numerous instances of misconduct by the plaintiff. For example, plaintiff allegedly used abusive and foul language in dealing with the Dean and his assistants, Professor Gathings, timekeeper Elaine Bowman, and the staff of the payroll office, Ms. Lee and Janice Jordan. Plaintiff allegedly absented herself from several classes and used her son to teach the class. Following transfer of the speech program, plaintiff failed to report to her new department Chairperson Dr. Covington, as directed.

106. Plaintiff never complained to the EEOC that Dean J. Butler had recommended that an adverse action be brought against plaintiff because of discrimination.

107. Plaintiff did not teach summer classes in 1983 and had no contract to do so.

108. Dean J. Butler, upon recommendation of the Council of Chairs, concluded that students were best served by teaching summer courses in English, Foreign language, Introduction to Logic, and Speech during a ten week period, and therefore summer speech classes for 1983 and subsequent years have been taught during a ten week period. Plaintiff has been offered the opportunity to teach 10 week summer classes in speech. Plaintiff has not availed herself of such opportunities.

109. Plaintiff complained to the EEOC that the Dean's decision that speech summer classes be taught as a ten week course was based on discrimination.

110. During academic year 1983 to 1984, plaintiff had a contract with UDC for the position of Professor, Step 9 ($39,010).

111. For evaluation period January 1983—August 1983, the Evaluation Committee gave plaintiff an evaluation total score of 39 percent. Dean J. Butler exercised his option to non-concur in the evaluation for all bargaining unit faculty in the Department of Communication Arts and Sciences (which includes plaintiff) because of irregularities in the evaluation process. For example, all bargaining unit faculty within the Department of Communication's Arts and Sciences were rated as good. The dean did not evaluate the merits of the documentation in the folder. Dean J. Butler did not recommend any bargaining unit faculty members in the Department of Communication Arts and Sciences for a step increase.

112. Plaintiff was initially issued a faculty notice for a retention contract for the 1984–85 academic year (professor, step 9, $41,360). Plaintiff appealed that contract to the UDC President. UDC President Green granted plaintiff's appeal and awarded her a one step increase for the 1984–85 academic year (professor, step 10).

113. Plaintiff did not complain to the EEOC that her evaluation for 1983, the Dean's failure to concur in that evaluation, or the Dean's failure to recommend a step

increase for plaintiff for the 1984–85 academic year was based on discrimination.

114. Plaintiff did not report for duty on August 16, 1983. Plaintiff reported for work on August 29, 1983. Plaintiff's time and attendance was not certified for those days she was absent from duty and she was not paid for those days. See following memoranda: (1) August 23, 1983, J. Butler to Covington, "Faculty Members Failure to report for Duty"; (2) August 31, 1983, Covington to J. Butler, "Unexcused absence from departmental Responsibilities—Dr. Helen Martin-Trigona"; (3) August 31, 1983, Covington to J. Butler, "Time certification for pay period ending August 31, 1983, Dr. Helen Martin-Trigona, Willie Fay Garrett".

115. On September 19, 1983, plaintiff complained to Dr. Ewaugh Fields, Interim Coordinator for Academic Affairs, UDC Office of Academic Affairs, that she was improperly denied her pay for the period August 16, 1983 through August 31, 1983.

116. On September 23, 1983, Dr. Ewaugh Fields responded to plaintiff's complaint. She concluded that the non-certification of time for [plaintiff] during the period August 16, 1983 through August 28, 1983, was appropriate and in full accordance with the Master Agreement and University procedures." Dr. Fields found that plaintiff was informed of her responsibilities, plaintiff was absent from work on August 16, 17, 18, 19, 22, 23, 24, 25 and 26, 1983 without authorization and plaintiff had not requested leave.

117. Plaintiff did not complain to the EEOC that the noncertification of her time for August 16, 17, 18, 19, 22, 23, 24, 25, and 26, 1983 and lack of pay for such days was based on discrimination.

118. On February 19, 1984 (Sunday), plaintiff informed Chairperson Dr. Covington by letter that she was leaving for Florida on February 19, 1984 and that she would be absent February 21 (Tuesday)—23 (Thursday), 1984.

119. Chairperson Dr. Covington informed plaintiff that her leave was unauthorized because she had not requested and obtained approval for the leave before taking the leave and that her time would not be certified for February 21, 22 and 23, 1984, when she was absent from work. Memorandum, February 28, 1984, Covington to Martin-Trigona, Unauthorized Leave.

120. Plaintiff complained to the EEOC that her lack of pay for missing three days in February 1984 was based on discrimination.

121. The pay of UDC faculty members is not withheld for disciplinary reasons. Pay is withheld for unauthorized leave.

In the College of Liberal and Fine Arts, Assistance Professor W.F. Garrett had pay withheld for absence from work on August 16, 17, 18, 19, 1983. Ms. Garrett is a black female. Laura Murray, College of Liberal and Fine Arts, had pay withheld for absence from work for pay period 8/16/84—8/31/84. Ms. Murray is a black female. Wilbert Rogers, College of Liberal and Fine Arts had pay withheld for absence from work for pay period 8/16/83—8/31/83. Mr. Rogers is a black male. In the College of Liberal Sciences, Brahama Kaushiva had pay withheld for absence from work. Mr. Kaushiva is an Indian male.

122. Plaintiff's Schedule for Fall 1983.

During fall 1983, plaintiff's schedule was as follows:

| Public Speaking | TR | 8:00–9:20 a.m. | Bldg. 41 |
| Public Speaking | MWF | 9:00–9:50 a.m. | Bldg. 13 |
| Public Speaking | TR | 11:00–12:20 p.m. | Bldg. 13 |
| Public Speaking | TR | 12:30–1:45 p.m. | Bldg. 13 |

Plaintiff's schedule had classes five days a week. On Tuesday and Thursday, plaintiff had classes on both the Van Ness and the Mount Vernon Campuses.

123. Other UDC faculty have classes five days a week. For example, the following faculty members of the Department of Communication Arts and Sciences, plaintiff's department, had classes five days a week during the fall of 1983: Wilhemina Reveron, Nona Stokes, and Dr. Helen Martin-Trigona.

124. No other member of plaintiff's department had classes on both the Van Ness and the Mount Vernon campuses on the

same day in the fall of 1983. The Master Agreement does not require that a professor's classes on the same day be located on only one campus.

125. Plaintiff's 1983 fall class schedule was not based on discrimination.

126. During the Summer of 1984, plaintiff did not teach summer classes and did not have a contract to do so.

127. The speech courses for summer of 1984 were only offered as a 10 week course. Plaintiff was not willing to teach a 10 week speech course during the summer.

128. During academic year 1984 to 1985, plaintiff had a contract with UDC for the position of Professor, step 10. Step 10 is the highest step for a professor.

129. For evaluation period calendar year 1984, plaintiff received an evaluation score of 89 percent from her Evaluation Committee.

130. Dean J. Butler concurred, with reservations, because much of the documentation included was not professionally relevant and had been used in previous evaluations. Based on a tentative agreement between the UDC management and the faculty union, a one-time bonus will be paid to all bargaining unit members in 1985 instead of awarding merit step increases. Plaintiff was issued a retention contract for the 1985–1986 academic year (professor, step 10). See following memoranda: (1) Faculty Evaluation Profile for Martin-Trigona, score 89 percent; (2) April 1, 1985, Jackson to all Deans, Funds for promotions in academic rank.

131. Plaintiff did not complain to the EEOC that her evaluation for the 1984 calendar year or her contract for the 1985–86 academic year was based on discrimination.

132. Defendant has not violated plaintiff's rights under the contract, internal UDC policy handbooks or customs because of plaintiff's race, sex, or complaints. Plaintiff was issued a 1984 fall semester teaching schedule which did not fully comply with the Master Agreement. During fall 1984, plaintiff's schedule was as follows:

| Public Speaking | TR | 8:00–9:20 a.m. | Bldg. 41 |
| Public Speaking | MWF | 9:00–9:50 a.m. | Bldg. 13 |
| Public Speaking | TR | 5:30–6:50 a.m. | Bldg. 13 |
| Debate Techniques I | TR | 11:00–12:20 p.m. | Bldg. 41 |

This schedule was not fully consistent with the Master Agreement because the schedule for Tuesdays and Thursdays extended from 8:00 a.m. to 6:50 p.m., which is more than eight hours, and plaintiff had not stated that she was willing to teach a schedule extending over more than eight hours in one day.

133. Plaintiff's 1984 Fall semester teaching schedule was not issued because of any discrimination against plaintiff. The class schedule extending over more than eight hours in one day was issued by mistake. UDC management offered to adjust plaintiff's fall schedule or to reduce her 1985 Spring semester courses. Plaintiff exercised the option of having her 1985 Spring semester courses reduced.

134. Plaintiff did complain to the EEOC regarding her 1984 fall semester teaching schedule.

135. During the summer of 1985, plaintiff did not teach summer classes and did not have a contract to do so.

136. The speech courses for summer 1985 were only offered as a 10 week course. Plaintiff is not willing to teach a 10 week speech course during the summer.

137. During academic year 1985 to 1986, plaintiff has a contact with UDC for the position of Professor, step 10.

138. At no time have Dean J. Butler, Dr. Ann Covington or any other UDC employee discriminated against the plaintiff in her employment.

139. The plaintiff has not been retaliated against as a result of filing this lawsuit.

## II

The allocation of burdens in Title VII cases of discrimination has been clearly set forth by the Supreme Court. First, the plaintiff has the burden of proving by a preponderance of the evidence a *prima facie* case of discrimination. *Texas Department of Community Affairs v. Burdine,*

450 U.S. 248, 252, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981). Should the plaintiff succeed, the burden of production, not proof, then shifts to the defendant to articulate a legitimate non-discriminatory reason for the action complained of, or to directly rebut the *prima facie* case. *Id.*, 450 U.S. at 253, 101 S.Ct. at 1093; *Metrocare v. Washington Metropolitan Transit Authority*, 679 F.2d 922 (D.C. Cir.1982). The plaintiff then has the opportunity to demonstrate, by the preponderance of the evidence, that the reasons put forth by the defendant were merely a pretext for discrimination. *Burdine*, 450 U.S. at 252–253, 101 S.Ct. at 1093–94.

■ Within this framework, the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff. *Milton v. Weinberger*, 696 F.2d 94 (D.C.Cir.1982), quoting *Burdine* at 450 U.S. 250, 101 S.Ct. at 1092; *United States Postal Service Bd. of Governors v. Aikens*, 460 U.S. 711, 714–16, 103 S.Ct. 1478, 1481–82, 75 L.Ed.2d 403 (1983); *Ethnic Employees of the Library of Congress v. Boorstin*, 751 F.2d 1405, 1417 (D.C. Cir.1985); *Freeman v. Lewis*, 675 F.2d 398, 400 (D.C.Cir.1982).

■ Plaintiff established a prima facie case of unlawful employment discrimination under *Burdine* based upon her race and sex. Such a prima facie case is established when the plaintiff proves that (a) she belonged to a class of persons protected by Title VII, (b) she was qualified for the promotion/salary increase for which she was not selected (c) she was not selected, and (d) after the non-selection the employer granted the promotion/salary increase to a member of a different class than the plaintiff or the plaintiff was rejected at the same time a member of another group was selected.

■ When, as here, a plaintiff alleges a case of "reverse discrimination," the *prima facie* case requirements are more onerous than those just discussed. The plaintiff must also show that "background circumstances support the suspicion that the defendant is that unusual employer who discriminates against the majority." *Parker v. Baltimore & O.R. Co.*, 652 F.2d 258, 263, (D.C.Cir.1981). *Lanphear v. Prokop*, 703 F.2d 1311, 1315 (D.C.Cir.1983).

■ While plaintiff established a *prima facie* case, the defendant in meeting that case has established legitimate, nondiscriminatory reasons for the failure to award step-increases to the plaintiff. Based upon the totality of the evidence, defendant's failure to award step increases to the plaintiff was based upon the conclusions of the plaintiff's Faculty Evaluation Committee, the Dean's criteria for recommending step increases, and the failure of the plaintiff and her Faculty Evaluation Committee to complete such evaluations and was not based on any discrimination. The Dean of Liberal and Fine Arts and the plaintiff's Department Chairpersons were not aware of or on notice of any discrimination against plaintiff by her peer-Faculty Evaluation Committee.

■ Plaintiff has not established a prima facie case of discriminatory discipline. Plaintiff was not paid for work when she was absent from work without authorization of her leave. Plaintiff has not established that black or male UDC faculty members were absent from work without authorization and were paid by UDC for such authorized leave.

Moreover, defendant established legitimate, nondiscriminatory reasons for its refusal to pay plaintiff for unauthorized absence from work. Based upon the totality of the evidence, defendant did not discriminate against the plaintiff.

■ The *McDonnell Douglas* framework is also applicable to the plaintiff's claim for retaliation. In order to establish a prima facie case of retaliation, the plaintiff must show: (1) that she engaged in a statutorily protected activity, (2) that the employer took an adverse personnel action; and (3) that a casual connection existed between the two. *Canino v. EEOC*, 707 F.2d 468, 471 (11th Cir.1983); *Smalley v. City of Eatonville*, 640 F.2d 765, 769 (5th Cir.1981). The plaintiff needs to establish

facts sufficient to permit an inference of retaliatory motive, which the defendant must rebut by articulating a legitimate, nondiscriminatory reason for the personnel action. At that point the plaintiff must prove by a preponderance of the evidence that the proffered reason was but a pretext for retaliation. Here, the defendant has articulated legally cognizable and viable reasons for various personnel actions concerning plaintiff, during the pendency of this lawsuit. The plaintiff cannot overcome this showing, and therefore, has failed to show by a preponderance of the evidence that she has been retaliated against.

■ Plaintiff did not file a timely charge with the EEOC with respect to many of the personnel actions which she contends were discriminatory. Although she did file a charge with the EEOC on June 15, 1984, many of the personnel actions which she now alleges were discriminatory were never raised before the EEOC.

Plaintiff has not demonstrated any circumstances which warrant equitable tolling of the requirements that alleged discriminatory actions be raised before the EEOC and that such actions be raised in a timely manner.

Defendant has been prejudiced by plaintiff's failure to raise alleged discriminatory actions before the EEOC and by her failure to challenge such actions in a timely manner.

The claims which may be raised by plaintiff under Title VII are limited to personnel actions which both (1) occurred between October 20, 1983 and June 15, 1984, and (2) were raised in plaintiff's charge and affidavit filed with the EEOC.

### III

In sum, after considering all of the evidence in this case the Court concludes that the defendant, its officers and employees, did not discriminate against the plaintiff either on the basis of her sex or on the basis of her race. Moreover, the Court concludes that the defendant did not retaliate against the plaintiff because the plaintiff engaged in a statutorily protected activity. The Court is satisfied, based upon all of the evidence presented that the defendant has demonstrated that while it took certain adverse actions against the plaintiff, it did not take such actions based upon discrimination or retaliation. The Court is further satisfied that the reasons proffered by the defendant for its actions was not a pretext for discrimination or retaliation.

In view of the above the Court has entered an Order dismissing this case with prejudice.